**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS**

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> LAMINATION SERVICE, INC., a Tennessee corporation;  LSI GRAPHICS LLC, a Tennessee limited liability company, EZZELL ENTERPRISE, INC., a Tennessee corporation, HES LIMITED (also DBA AS BEIJING DECENET, DECENT TECHNOLOGY CO. LTD., HARDWARE FOCUS, QDQB TECH HARDWARE, CASSIA NETWORK LIMITED, and GLOBAL NETWORKS TECHNOLOGY), a Chinese limited company, and DOES 1-50, <br><br> Defendants. | Case No. <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI" and together with CSI, "Cisco" or "Plaintiffs") hereby complain and allege against Defendants LAMINATION SERVICE, INC. and LSI Graphics LLC (collectively "LSI "), EZZELL ENTERPRISES, INC., HES Limited, ("HES"), and Does 1-50, inclusive (collectively "Defendants") as follows:

## I.      INTRODUCTION

1.      As set forth in detail below, Cisco has uncovered a significant and willful infringement scheme by Defendants, which involves the production of counterfeit "Cisco" networking products in China, importing those counterfeit products into the United States, and

1

selling those counterfeit products to government and non-government customers.  Customers purchasing such products are duped into thinking they are in fact getting new, "factory sealed" genuine Cisco branded products, causing significant harm not only to the duped customer, but also to Cisco, its brand, and its established reputation for producing the highest quality networking communications and information technology products and services.  Cisco's customers rely on Cisco products to run complex, critical and highly secured networks.   But counterfeit Cisco products can cause network downtime and substantial business interruption. Cisco brings this Action to protect Cisco customers from receiving inferior counterfeit products, to put a stop to Defendants' unlawful and infringing conduct, to enjoin further unlawful and infringing conduct, and to recover full damages for the significant harm they have caused.

## II.    THE PARTIES

2.    Plaintiff Cisco Systems, Inc., is a Delaware corporation as of January 25, 2021, and at all earlier times mentioned herein was, a California corporation, with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.  Plaintiff Cisco Technology, Inc., is, and at all times mentioned herein was, a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.  CTI owns the trademarks used by CSI in marketing Cisco-branded products.

3.    Defendant Lamination Service Inc., is, and at all relevant times was, a Tennessee for profit corporation.  LSI Graphics LLC, is, and at all relevant times was, a Tennessee limited liability company.  Both defendants are, and at all times relevant were, operating at 2950 Brother Blvd., Suite 103, Bartlett, Tennessee.

4.    Defendants Ezzell Enterprises Inc. is, and at all relevant times was, a Tennessee for profit corporation, operating at 2950 Brother Blvd., Suite 103, Bartlett, Tennessee.

5.    Defendant HES is a business entity that, upon information and belief, is a Chinese Limited Company with its principal business location in Hong Kong, China.  On information and belief, HES also does business as "Beijing Decenet," "Decenet Technology Co., Ltd," "Hardware Focus", "QDQB Tech Hardware," "Cassia Network Limited, and "Global Networks Technology," all operating from the same address of Unit 03E, 15/F, Carnival Commercial

Building, 18 Java Road, North Point, Hong Kong, and elsewhere in China.  Upon information and belief, Cisco alleges that HES is affiliated with Acentre Co Limited, operating from No. 10 Information Road, Haidian District, Beijing, 100193 China.  HES conducts business throughout the United States, including within the State of Tennessee, by exporting counterfeit products to Tennessee and elsewhere in the United States, and engaging in sales transactions with resellers of Cisco products.  Through this sales practice, HES sells products to resellers in the state of Tennessee, including LSI.  Cisco is informed and believes, and therefore alleges, that products sold by HES to resellers in the United States are ultimately sold to end customers within the State of Tennessee and elsewhere in the United States.

6.     Cisco is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, corporate, associate, or otherwise. Due to the surreptitious nature of Defendants' actions, the identities of Does 1 through 50 have been concealed from Cisco, preventing Cisco from identifying them by name.  After discovery, which is necessary to ascertain the true names and capacities of Does 1 through 50, Cisco will amend this Complaint to show the true names and capacities of these Doe defendants and allege the necessary identifying details.

7.     Cisco is informed and believes, and thereon alleges, that each of the Defendants designated herein as a Doe is legally responsible, in some manner, for the events and happenings herein referred to, and legally caused damages to Cisco as herein alleged.

8.     At all times relevant to this action, each defendant, including those fictitiously named defendants, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the other defendants and was acting within the scope of that agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

9.     Indeed, as alleged in further detail below, each Defendant played a necessary role in the infringing distribution chain that ultimately resold counterfeit and otherwise infringing Cisco branded products to the public.  As such, each Defendant is jointly and severally liable for the damages caused by the unlawful conduct.

### III.   JURISDICTION

10.    This is an Action for violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act"), and related causes of action.  This Court has original subject matter jurisdiction over this Action pursuant to the provision of the Lanham Act, 15 U.S.C. § 1121, as well as under 28 U.S.C. §§ 1331 and 1338(a) and (b).

11.    This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

12.    This Court has personal jurisdiction over Defendants, who have engaged in business activities in this district, misled consumers in this district, knowingly and purposefully directed business activities at this district, and have committed tortious acts, knowing Cisco would suffer any injuries in this district.

13.    Cisco is informed and believes, and thereon alleges, that both LSI's and Ezzell Enterprise Inc.'s owners and management are citizens and residents of the State of Tennessee, and/or are doing business in the State of Tennessee, and/or participated in or undertook obligations or rights arising out of the subject events and happenings herein referred to, engaged in actions or omissions, either intentional or negligent, regarding the subject events and happenings herein referred to, and/or benefited unjustly from the efforts, work, and goods of Cisco.

14.    Cisco is informed and believes, and thereon alleges, that Defendant HES (and its associated DBA's listed above) is doing business in the State of Tennessee, and/or participated in or undertook obligations or rights arising out of the subject events and happenings herein referred to, engaged in actions or omissions, either intentional or negligent, regarding the subject events and happenings herein referred to, and/or benefited unjustly from the efforts, work, and goods of Cisco.

### IV.   VENUE

15.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Cisco's claims occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this district.  Venue is further proper in this district, pursuant to 28 U.S.C. § 1400(a), as Defendants or their agents may be found in this district.

## V.     FACTUAL ALLEGATIONS RELEVANT TO CISCO, ITS INTELLECTUAL PROPERTY, AND DEFENDANTS' UNLAWFUL SCHEME

### A.     Cisco's Business And History

16.     Founded in 1984, Cisco is the worldwide leader in developing, implementing, and providing the technologies behind networking communications, and information technology products and services.  Cisco develops and provides a broad range of networking products and services that enable seamless communication among individuals, businesses, public institutions, government agencies, and service providers.  Specifically, the thousands of engineers who work at Cisco develop and provide networking and communications hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities and campuses, and around the world.

17.     Since its founding, Cisco has pioneered many of the important technologies that created and enabled global interconnectivity.  During the past three decades, Cisco has invested billions of dollars, and the time and dedication of thousands of its engineers, in the research, development, and sale of industry leading networking and communications products and services.

18.     Cisco has also built up tremendous goodwill and brand reputation among consumers, including corporate and government consumers, through significant investment in advertising, promoting, and delivering products, software, and services of the highest quality under Cisco's trade name and the family of Cisco-related trademarks (the "Cisco Marks").  Cisco has used the family of Cisco Marks to identify goods and services as being genuine and authorized, and therefore, the Cisco Marks are well-recognized signifiers of Cisco's best-in-class products, software, and services.

B.    **Cisco's Trademarks**

19.    CTI owns all rights, title, and interest in the Cisco Marks, which are included on the Principal Register of the U.S. Patent and Trademark Office.  The Cisco Marks are well-known.  They are used in connection with Cisco's networking hardware and software products and services.  They include, but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
|------|---------------------|-------------------|
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO | 2,498,746 | October 16, 2001 |
| CISCO | 3,709,076 | November 10, 2009 |
|  | 3,759,451 | March 9, 2010 |
|  | 3,763,903 | March 23, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |

20.    The Cisco Marks are distinctive, having no meaning outside of their use by Cisco in its course of business operations and in its advertising to distinguish its products and services. Cisco uses the Cisco Marks to advertise through a wide variety of media including television, radio, newspapers, magazines, billboards, direct mail, and web sites.

21.    Cisco has attained one of the highest levels of brand recognition among consumers due to its extensive advertising and promotional efforts and its continuous use of its core Cisco Marks for the past three decades.  As a result of Cisco's longstanding and widespread use and promotion of the Cisco Marks, Cisco customers around the globe have come to rely upon the Cisco Marks to identify Cisco's high-quality hardware, software, and services.  Many of Cisco's products are purchased by the U.S. Government, the military, hospitals, and by other industries, in critical and life-essential applications.

22.    Cisco's customers associate Cisco's famous and well-known trademarks, including, among others, CISCO and the Cisco Logo exclusively with Cisco and Cisco's

products and services. When consumers encounter these marks and decide to purchase goods and services identified by these marks, they expect to receive genuine Cisco products that have been produced by Cisco. Moreover, when consumers purchase products that are advertised as "new factory sealed," they believe that they are purchasing genuine products manufactured by Cisco that have not been tampered with from the time the product was sealed in its shipping packaging. Thus, knowing that these products are not actually "new factory sealed" would be highly relevant and material to a consumer's purchasing decision.

**C.      Counterfeit And Otherwise Materially Different "Cisco" Products**

23.     Counterfeit products that bear markings similar to the Cisco Marks provide customers with a false assurance that the products they have purchased (1) are reliable and conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under a Cisco service support contract (*i.e.,* SMARTnet) without the need for payment of extra amounts for inspection and relicensing, and (4) come with all of the necessary accessories sold with the product that have been selected and approved by Cisco for use with the product.

24.     In addition to harm to customers, the sale of counterfeit Cisco products also harms Cisco in many ways. Among these, counterfeit Cisco products which fail or degrade create the false impression that Cisco products are unreliable, thereby improperly tarnishing Cisco's reputation and causing Cisco to suffer lost sales and future business opportunities. When customers purchase Cisco-branded parts that are counterfeit and unreliable, their image of Cisco is diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may be lost forever. As a result, Cisco suffers substantial and irreparable harm to its brand, image, business, and goodwill with the public. Cisco also suffers lost sales when customers purchase counterfeit products instead of genuine Cisco products.

**D.** **Impact on Health, Safety, and National Security Caused By Counterfeit Cisco Products**

25.     Cisco products are part of the backbone of the United States information technology network.   Many of Cisco's products are purchased by U.S. governmental entities, the military, hospitals, and by other industries, and are used in important and life-essential applications.  Critical governmental and other infrastructure is built on, and relies upon, Cisco products to maintain the security of data storage and transfer.

26.     The importance of critical functions being able to rely upon the quality of Cisco products cannot be overstated.  Cisco firewalls, for example, ensure the integrity of government, medical, and business data and communications.  Many critical government functions rely upon the performance of high-quality Cisco products, as compared to non-genuine products.  In a criminal trial involving counterfeit Cisco products sold to the U.S. Marines, a Marine (Staff Sargent Lee Chieffalo) testified that he specifically demanded genuine Cisco products when he ordered them, because if the networks that the "Cisco" products were in failed due to substandard counterfeit products, "Marines could die."

27.     Based upon publicly available databases of government contracts, Cisco alleges on information and belief that LSI has had 370 federal government contracts during the period from 1983 to 2019, 117 of which were signed since January 1, 2010.  At least 15 of these contracts specifically included the sale of Cisco-branded products.  Federal agencies to whom LSI has sold Cisco-branded products include: United States Army, Centers for Disease Control and Prevention, Nuclear Regulatory Commission, Federal Emergency Management Agency, Department of Veterans Affairs, and Internal Revenue Service.

28.     LSI also claims to sell an integrated software and hardware solution to manage badge access to secure facilities.  LSI's website claims: "*Currently, BMS [Badge Management System] is considered an industry leader for high-end, customizable photo-ID card software, and is being used by a wide range of organizations throughout the nation ranging from The New Jersey State Police and The University of Florida to the Metropolitan Nashville Public School System and The Senate and House of  Representatives of the United States.  Over the past two*

*decades, LSI has solidified our position in the card personalization software market and has also become a significant player in the ID/Access card hardware, hardware support, supplies, and accessories markets. We currently have a dedicated staff of 14 individuals in our ID/Access card division, which includes sales, marketing, software programming, system integration teams, and hardware service/support"* LSI's website does not make clear whether Cisco products are integrated into this offering. .

29.     Based upon publicly available databases of government contracts, Cisco alleges on information and belief that Thomas Ezzell, who is listed on the Tennessee Secretary of State website as the Registered Agent for Ezzell Enterprise, Inc., has entered into 11 federal government contracts with Defense Logistics Agency and Department of Veteran Affairs during the period from 2016 to 2018.

30.     On August 25, 2020, Chinese law enforcement authorities raided a total of seven sites in China connected with HES to search for counterfeit Cisco products.  The raids culminated in the seizure of over 1,200 counterfeit Cisco products, including counterfeit "Cisco" switches, routers, wireless controllers, power supplies, and transceivers.  Of great concern, Chinese authorities also seized 500 counterfeit Cisco labels, eight rolls of counterfeit Cisco security labels, and 50 counterfeit Cisco Carton Boxes.  This is evidence that HES has been running a very active and sophisticated counterfeiting operation from China, pumping out large quantities of counterfeit "Cisco" products.  Cisco alleges upon information and belief that a significant amount of the counterfeit products ended up in the United States, because more Cisco products are used in the United States than anywhere else in the world.

### E.     Cisco's Warranty and Support Programs

31.     Cisco supports its products through several means, including: (1) a warranty program that varies based on the product, ranging from 90 days to a limited lifetime warranty ("Warranty"), and (2) a more comprehensive suite of service and support offered to customers for a fee, collectively called SMARTnet Service ("SMARTnet").  The Cisco Warranty is non-transferable and is provided solely to the original End User of the equipment.  A SMARTnet contract entitles the holder of the contract to receive software updates and upgrades for the

hardware that is covered by the contract, access to Cisco's Technical Assistance Center ("TAC"), and oftentimes advance replacement of the product if it fails and TAC cannot assist the customer to make it operational.  Cisco SMARTnet contracts are available to the original End User of the product, unless the product is inspected and re-licensed by a subsequent End User, in which case the subsequent End User is entitled to purchase a SMARTnet contract.  Only Authorized Channel Partners are permitted to sell SMARTnet contracts, and then only to End Users for products purchased through Cisco's authorized sales channel.

### F.    Cisco's Sales and Distribution Channels

32.    Cisco is one of the United States' largest and most innovative companies.  The volume of Cisco's yearly sales revenue of hardware, software, and related services is approximately $50 billion dollars world-wide.  In order to support this global market, for the great majority of its sales, Cisco relies upon a system of independent distributors and resellers located throughout the world.  This system is commonly used in the IT hardware and networking industry.  These independent distributors and resellers, referred to as "Authorized Channel Partners" or "Authorized Resellers," typically represent several other equipment manufacturers, in addition to Cisco.  Among other things, Cisco's distribution system allows it to maintain expertise and a local presence in regions of the world where there would not otherwise be sufficient business to support it.

33.    Authorized Resellers are required to enter into contractual relationships with Cisco that allow them to purchase Cisco products and services at a partner discount from Cisco's authorized distributors.  The most common contractual relationship is called an Indirect Channel Partnership Agreement ("ICPA").  This agreement requires Authorized Resellers to purchase Cisco products and services only from Cisco or authorized distributors and to sell those products and services only to end customers for their internal use ("End Users").

34.    Cisco's Authorized Resellers are the direct interface with the customers who use Cisco's products and services.  Cisco's Authorized Resellers identify sales opportunities, provide technical assistance in selecting products, recommend solutions to address their customers'

unique needs, conduct pre-sales and sales support, supply the needed products, and providing post-sales support for the products.

### G.     LSI's History Of Unlawful Importation of Counterfeit Cisco Products

35.     On information and belief, Defendants operate a complex scheme, without the consent of Cisco, to import, distribute, transport, sell, or assist in or cause the sale, importation, distribution, or transportation in interstate commerce of products bearing unauthorized reproductions, copies, counterfeits, and colorable imitations of the Cisco Marks.

36.     U.S. Customs and Border Patrol has seized a number of counterfeit Cisco products imported by LSI, including those shown below:

| Seizure Notice # | Date of Import | Description | Importer | Exporter |
|---|---|---|---|---|
| 2016-4197-103531-01 | 4-Aug-16 | 19 Cisco Products | LSI (2950 Brother Blvd. Apt. 103, Bartlett, TN 38133) | Yuheng Data Hardware Intl. |
| 2017-4197-102410-01 | 22-Apr-17 | 3 Counterfeit Cisco Switches WS-C2960-24TT-L | Lamination Services Inc. (2950 Brother Blvd., Suite 103, Bartlett, TN 38133) | Grace Xiong |
| 2018-4197-000353-01 | 14-Jun-18 | 10 Counterfeit Cisco Switches WS-X4748-RJ45-E | LSI (2950 Brother Blvd. Apt. 103, Bartlett, TN 38133) | Global NT |
| 2018-4197-001108-01 | 5-Sep-18 | 2 Cisco Switches | LSI (2950 Brother Boulevard, Bartlett, TN 38133) | YW |
| 2018-4197-001154-01 | 6-Sep-18 | 1 Counterfeit Cisco Switch | Lamination Services Inc. (2950 Brother Blvd., Suite 103, Bartlett, TN 38133) | My Technology |
| 2018-4197-102177-01 | 14-Mar-18 | 2 Counterfeit Cisco Switches | Lamination Services Inc. (2950 Brother Blvd., Suite 103, Bartlett, TN 38133) | Clare |

| Seizure Notice # | Date of Import | Description | Importer | Exporter |
|---|---|---|---|---|
| 2018-4197-102178-01 | 14-Mar-18 | 2 Counterfeit Cisco Switches | Lamination Services Inc. (2950 Brother Blvd., Suite 103, Bartlett, TN 38133) | Kevin |
| 2019-4197-000087-01 | 10-Oct-18 | 5 Each of Cisco Switches | LSI (2950 Brother Boulevard, Bartlett, TN 38133) | YW |
| 2019-4197-000117-01 | 11-Oct-18 | 4 Cisco Switches | LSI (2950 Brother Blvd. #103 Bartlett, TN 60103) | DHL-Beijing |
| 2019-4197-003219-01 | 13-Aug-19 | 2 Each Cisco Switches C9300-24P-A | Ezzell Enterprises Inc. (2950 Brother Blvd., Bartlett, TN 38133) | JM Utou Space |
| 2019-4197-003220-01 | 13-Aug-19 | 2 Each Cisco Switches C9300-24P-A | Ezzell Enterprises Inc. (2950 Brother Boulevard Bartlett, TN 38133) | My Technology |
| 2019-4197-003238-01 | 3-Jul-19 | 2 EA Cisco Switch | Ezzell Enterprises Inc. (2950 Brother Boulevard Bartlett, TN 38133) | My Technology |
| 2019-4197-003239-01 | 14-Aug-19 | 2 Each Cisco Switches C9300-24P-A | Ezzell Enterprises Inc. (2950 Brother Blvd., Bartlett, TN 38133) | JM Utou Space |

37.     On November 11, 2019, Cisco's outside counsel sent a Cease & Desist letter to Ezzell Enterprises with regard to the three CBP seizures in August 2019 of six switches.  Britt Daniel, President of LSI, responded by email on November 19.  He stated that the products came from HES.  He claimed that LSI had not "officially order[ed]" them.  He also provided an email chain with "Ed" at HES, using the email address of ed@hesid.com.  Ed provided a chart of eight C9300-24P-A switches, broken down into four shipments of two switches each, and stated "Below units which I discussed with Eric we have shipped to you last 2 days.  We are still waiting for your po to process invoices.  Can you please send po asap?"

**H.**   **LSI's Prior History Of Unlawful Sales of Counterfeit Cisco Products**

**1.   Sale of Counterfeit Transceivers to City of Toledo (2012)**

38.      On or around October 23, 2012, LSI sold 52 Cisco-branded GLC-LH-SM transceivers to the City of Toledo.  Cisco evaluated one of the GLC-LH-SM transceivers and determined it was counterfeit.

39.      On January 8, 2013, Cisco's outside counsel sent a Cease and Desist letter to LSI regarding this sale and requested documents regarding this transaction.  LSI provided documentation indicating that LSI sourced the products from CentricsIT, an unauthorized broker in Georgia.

**2.   Sale of Counterfeit Transceivers to United States Army (for New York National Guard) (2013).**

40.      On or about November 18, 2013, Cisco was contacted by the United States Army regarding two Cisco-branded SFP-GE-Ts  purchased from LSI.  The Army provided the LSI Packing List and photographs of the units for analysis.  A manufacturer for Cisco, Methode Electronics, examined two SFP-GE-T transceivers that LSI supplied to the Army, and determined that the two units were counterfeit.

41.      Following this determination, on December 16, 2013, Cisco's counsel sent LSI a second cease and desist letter regarding this sale of counterfeit SFP-GE-Ts.  On December 17, 2013, LSI responded and identified CentricsIT as the source of the products, and provided documentation regarding the same.  In other words, LSI sourced Cisco transceivers from the same source that sold it counterfeit transceivers months earlier in complete disregard of the Cease and Desist letter LSI received regarding that earlier transaction..

42.      On January 16, 2014, Cisco's counsel sent LSI a follow-up letter requesting that all other "Cisco" products purchased from CentricsIT be quarantined.  In response, Britt Daniel of LSI stated the counterfeit items sold to the Army National Guard would be returned to Cisco and that the other products had been returned to CentricsIT.

### 3.   Sale of Counterfeit Transceivers to JR International (2015)

43.     In or about July 2015, an end user in Colombia reported a failed SFP-GE-T transceiver to Cisco, which determined that the product was counterfeit.  The end user identified a Cisco partner in Colombia as the source of the transceiver, and the partner provided invoices showing that unauthorized reseller JR International sold them the transceiver.

44.     Cisco's counsel sent a cease and desist letter to JR International, which cooperated by identifying that it purchased the counterfeit transceiver from LSI; JR International provided documents showing a purchase order of 67 SFP-GE-T transceivers from LSI on April 6, 2015.  During this period, Cisco's counsel had been communicating with Mason Ezzell, III at LSI regarding the sales of counterfeit Cisco products to the Government.  Cisco's counsel sent a follow-up letter to LSI based on this new information provided by JR International.

45.     LSI replied to Cisco's counsel on December 14.  LSI claimed that it purchased the transceivers in question from Digital Devices in England for $85.00 each.  The global list price for these transceivers was $440.00.

### 4.   Sale of Counterfeit Network Modules to Sourcing Solutions (2015)

46.     On November 4, 2015, CBP seized a shipment of five counterfeit Cisco catalyst modules.  Cisco's counsel sent a cease and desist letter to the importer, Sourcing Solutions, on March 8, 2016.  Sourcing Solutions cooperated with Cisco's demand and confirmed that their vendor for the seized products was LSI. The five products were WS-X6716-10G-3C modules. The list price for these products is $40,000 each.  LSI sold the products to Sourcing Solutions for $7,000 each, which is a remarkably low price and a major indicator that the product was suspect.

47.     Cisco requested that Sourcing Solutions quarantine other products from LSI in their possession, so that Cisco could examine them to determine whether they were genuine or counterfeit.  Sourcing Solutions supplied photographs of five additional products sourced from LSI that remained in their possession.  A Cisco engineer reviewed the photographs and determined that they were counterfeit.

48.     On June 10, 2016, Cisco's outside counsel sent a cease and desist letter to LSI. This letter informed LSI that it had previously been put on notice three times due to its sale of

counterfeit products, and noted the significant price disparity between its offering and genuine products.

49.     On June 23, 2016, LSI's Vice President, Brett K. Daniels, responded to the June 10, 2016 cease and desist letter.  In his response, Mr. Daniels claimed that LSI had "no intention of selling any counterfeit equipment from any manufacturer, including Cisco."  Mr. Daniels claimed that LSI was willing to cooperate with Cisco's investigation.  Mr. Daniels identified the vendor of the counterfeit products that LSI had supplied to Sourcing Solutions as Hardware Focus Limited.

50.     Hardware Focus Limited is identified on the invoice provided by LSI as having an address at Unit 03E, 15/F, Carnival Comm, 18 Java Road, Hong Kong, China.  This is the same address provided by HES.  LSI purchased the five WS-X6716-10G-3C units from Hardware Focus Limited for $5,600 each.  LSI sold the same units to Sourcing Solutions for $6,900 per unit.  The Global List Price set by Cisco for these units is $40,000.

## LSI'S WILLFULNESS

51.     Cisco contends that at the time of each sale noted herein, LSI was on notice that it was selling counterfeit Cisco products.  Cisco sent LSI its first Cease and Desist letter in January 2013.  Cisco sent four more Cease and Desist letters to LSI, but LSI continued its infringing conduct.  LSI continued to sell counterfeit Cisco products and import counterfeit Cisco products despite being explicitly warned by Cisco that its activities violated the law and put customers at risk.  Cisco further contends on information and belief that LSI received notification from the United States government, by Customs and Border Protection, after each of the 14 seizures—spanning August 2016 to August 2019—and LSI continued to purchase counterfeit Cisco products to import into the United States and sell to unsuspecting United States customers.  Cisco asserts on information and belief that LSI's continued sales of counterfeit Cisco products resulted from its willful selling of counterfeit Cisco products, or that it is the result of LSI's willful blindness to the fact that it was selling counterfeit Cisco products.

## FIRST CLAIM FOR RELIEF
### Federal Trademark Infringement
### (15 U.S.C. § 1114)
### Against All Defendants

52.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

53.     The Cisco Marks are valid, protectable trademarks that have been registered as marks on the principal register in the United States Patent and Trademark Office.  Cisco is the owner and registrant of the Cisco Marks.

54.     As described in more detail above, Defendants have used and counterfeited the Cisco Marks in connection with the marketing, promotion, and sale of their goods and services without Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, Defendants counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of Defendants' infringing products, counterfeit packaging, inferior warranty, and other related commercial activities.  As of the filing of this Complaint, Defendants are continuing to infringe the Cisco Marks unabated as alleged further above.

55.     The Cisco Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and universally associated in the public perception with the highest quality network and communications technology products and services.

56.     Defendants have sold, offered to sell, distributed, and advertised—and continue to sell, offer to sell, manufacture, distribute, and advertise—infringing networking hardware products bearing Cisco Marks.

57.     The differences between Defendants' unauthorized products and genuine Cisco goods are material, as consumers would consider those differences, alleged further above, to be material to their purchasing decisions.

58.     Defendants' actions have caused, and are likely to continue to cause, confusion, mistake, and deception as to the origin and quality of Defendants' unauthorized products because they are intentionally calculated to mislead the general purchasing public into believing that Defendants' unauthorized products originated from, are associated with, or are otherwise authorized by Cisco.

59.     Upon information and belief, Defendants' infringing actions were committed fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to and goodwill in the Cisco Marks, or with willful blindness to the same, and with the intent to cause confusion, to cause mistake and/or to deceive.  Accordingly, Defendants' actions constitute willful trademark infringement and counterfeiting of the Cisco Marks in violation of 15 U.S.C. §§ 1114 and 1117.

60.     Defendants' unauthorized use of the Cisco Marks constitutes trademark infringement of the federally registered Cisco Marks and has caused substantial damage to Cisco and to the reputation and goodwill symbolized by the Cisco Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.  Defendants' unauthorized use of the Cisco Marks was conducted intentionally and with notice and full knowledge that the use was unauthorized by Cisco.

61.     Cisco has been, and continues to be, damaged by Defendants' infringement, including by suffering irreparable harm through the diminution of trust and goodwill among Cisco consumers and members of the general consuming public and the trade.  Cisco is entitled to an injunction against Defendants, and an order of destruction of all infringing products, as well as all monetary relief and other remedies available under the Lanham Act, including but not limited to trebled damages and/or actual profits, reasonable attorney's fees, costs and prejudgment interest, and/or statutory damages.

## SECOND CLAIM FOR RELIEF
### Federal Trademark Counterfeiting
### (15 U.S.C. § 1114)
### Against All Defendants

62.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

63.     The Cisco Marks are valid, protectable trademarks that have been registered as marks on the principal register in the United States Patent and Trademark Office.  Cisco is the owner and registrant of the Cisco Marks.

64.     As described in more detail above, Defendants have used and counterfeited the Cisco Marks in connection with the marketing, promotion, and sale of their goods and services without Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, Defendants' counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of Defendants' infringing products, counterfeit packaging, inferior warranty, and other related commercial activities.  As of the filing of this Complaint, Defendants are continuing to infringe the Cisco Marks unabated as alleged further above.

65.     Defendants have publicly sold, offered to sell, and distributed counterfeit Cisco products in interstate commerce in direct competition with Cisco and without authorization or consent to use the Cisco Marks but with full knowledge of Cisco's notorious prior rights in those marks.

66.     Defendants' counterfeit Cisco products reproduce, counterfeit, copy, and colorably imitate the Cisco Marks or display a spurious designation that is identical with, or substantially indistinguishable from, the Cisco Marks.  Defendants have applied their reproductions, counterfeits, copies, and colorable imitations of the Cisco Marks to labels, prints, and packages intended to be used in commerce upon or in connection with the sale, offering for

sale, distribution, or advertising of Defendants' counterfeit products, which is likely to cause confusion, to cause mistake, or to deceive.

67.     Defendants' unauthorized use of the Cisco Marks on or in connection with Defendants' counterfeit products was conducted intentionally and with notice and full knowledge that the use was unauthorized by Cisco.  Accordingly, Defendants' actions constitute willful trademark infringement and counterfeiting of the Cisco Marks in violation of 15 U.S.C. §§ 1114 and 1117.

68.     Cisco has been, and continues to be, damaged by Defendants' infringement, including by suffering irreparable harm through the diminution of trust and goodwill among Cisco consumers and members of the general consuming public and the trade.  Cisco is entitled to an injunction against Defendants, and an order of destruction of all infringing products, as well as all monetary relief and other remedies available under the Lanham Act, including but not limited to trebled damages and/or actual profits, reasonable attorney's fees, costs and prejudgment interest, and/or statutory damages.

**THIRD CLAIM FOR RELIEF**
**Federal Unfair Competition**
**(15 U.S.C. § 1125)**
**Against All Defendants**

69.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

70.     Defendants' resale of infringing products that are designed to appear identical to genuine Cisco products and thereby employ the same nature, style, look, and color as genuine Cisco products.  Moreover, as alleged above, Defendants sell products that have affixed counterfeit or infringing versions or reproductions of the Cisco Marks to unauthorized products and/or to the packaging, wrapping, etc., in which the infringing products are packaged.  This unauthorized use of the Cisco Marks is likely to cause confusion, to deceive, and to mislead the consuming public into believing that there is some affiliation, connection, or association between Defendants and Cisco and is likely to cause confusion, mistake, or deception as to the origin, source, sponsorship, authorization, approval, or affiliation of Defendants' unauthorized products.

71.     Defendants' actions, including the unauthorized use of the Cisco Marks in commerce, constitute false designation of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which have caused, and are likely to continue to cause, confusion, mistake, and deception, as to Defendants' association or affiliation with Cisco, or lack thereof, as well as to the origin, source, and sponsorship of Defendants' unauthorized products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

72.     Defendants, in commercial advertising and promotion, misrepresent the nature, characteristics, qualities, or geographic origin of the Cisco products they sold, by falsely advertising that the infringing goods were genuine Cisco products and that the products were new, "factory sealed," and not disclosing that they are not covered by the manufacturer's warranty.  The false advertising concerned material information that was likely to influence a consumer's purchasing decision.

73.     Defendants' unauthorized and misleading use of the Cisco Marks constitute willful infringement of the Cisco Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

74.     Defendants' actions described above, including its unauthorized and misleading use of the Cisco Marks in commerce have caused, and unless enjoined, will continue to cause, substantial and irreparable injury to Cisco and to the business and goodwill represented by the Cisco Marks, thereby leaving Cisco without an adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**Tennessee Consumer Protection Act**
**(Tenn. Code Ann. § 47-18-101 et seq.)**
**Against All Defendants**

75.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

76.     Defendants have engaged in a number of actions that constitute unfair or deceptive acts or practices affecting the conduct of trade or commerce and that have been declared to constitute unlawful acts or practices pursuant to Tenn. Code Ann. § 47-18-104(b).

77.     Defendants' acts in violation of the Tennessee Consumer Protection Act include:

A.    Falsely passing off goods of another as if they were Cisco goods (Section 104(b)(1));

B.    Causing likelihood of confusion or misunderstanding as to the source of goods (Section 104(b)(2)); and

C.    Causing likelihood of confusion or misunderstanding as to whether the products being sold are somehow affiliated with, connected to, associated with, or certified by Cisco when such products are counterfeit products (Section 104(b)(3)).

78.    Because Cisco has sustained an ascertainable loss of money and the loss of other things of value as a result of Defendants' use of the unfair and deceptive acts and practices identified above, Cisco is entitled to bring a private right of action under Tennessee law against Defendants to recover actual damages pursuant to Tenn. Code Ann. § 47-18-109(a)(1).

79.    Further, because Defendants' unfair or deceptive acts and practices involved willful and knowing violations of the Tennessee Consumer Protection Act, Cisco requests that this Court award it treble damages consistent with Tenn. Code Ann. § 47-18-109(a)(3) and (4).

80.    Cisco also seeks entry of an award in its favor against Defendants, pursuant to Tenn. Code Ann. § 47-18-109(e)(1), for its reasonable attorney's fees and costs incurred in the prosecution of this action.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**
**Against All Defendants**

81.    Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

82.    Defendants unjustly received benefits at the expense of Cisco through their wrongful conduct, as alleged further above. Defendants continue to unjustly retain these benefits at the expense of Cisco.  The unjust receipt of the benefits obtained by Defendants lacks any adequate legal basis and thus cannot conscientiously be retained by Defendants.  Therefore, the circumstances of the receipt and retention of such benefits are such that, as between Cisco and Defendants, it is unjust for Defendants to retain any such benefits.

83.     Cisco is therefore entitled to full restitution of all amounts and/or other benefits in which Defendants have been unjustly enriched at Cisco's expense, in an amount to be proven at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE Cisco respectfully prays for the following relief:

A.      For entry of judgment in favor of Cisco and against Defendants on each of Cisco's claims for relief alleged in this Complaint;

B.      For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, attorneys, and affiliated companies, their assigns and successors in interest, and those persons in active concert or participation with them, from further acts of infringement of the trademarks at issue in this litigation, including inducing or contributing third parties to infringe, and further acts of unfair competition and/or false advertising against Cisco.

C.      For a determination that Defendants' acts of trademark infringement constitute cases of willful and exceptional infringement;

D.      For actual damages as a result of Defendants' unlawful conduct, alleged above, as well as any profits that are attributable to the alleged conduct and are not taken into account in computing Cisco's actual damages;

E.      For maximum statutory damages available under the law to the extent Cisco elects statutory damages for any claim for relief;

F.      For punitive damages to the fullest extent available under the law;

G.      For reasonable attorneys' fees to the fullest extent available under the law;

H.      For treble and/or enhanced damages to the fullest extent available under the law;

I.      For full restitution, including restoration of all property unlawfully taken from Cisco, as well as any ill-gotten gains from the resale of Cisco's property or other unjust benefits received and retained by Defendants;

J.      For prejudgment interest and the costs of prosecuting these claims to the fullest extent available under the law;

K.      For any additional injunctive, specific performance, and/or other provisional remedies, as appropriate; and,

L.      For such other and further relief as the Court deems just and proper.

Date: March 9, 2021:

LEWIS THOMASON

By: /s/ Brian S. Faughnan
Brian S. Faughnan, Esq. (BPR # 19379)
One Commerce Square
40 South Main Street, 29th Floor
Memphis, Tennessee 38103
(901) 577-6139
bfaughnan@lewisthomason.com

and

SIDEMAN & BANCROFT LLP[1]

Richard J. Nelson, Esq. (Cal. Bar No. 141658)
James A. Shore, Esq.    (Cal Bar No. 129083)
Angela M. He, Esq.      (Cal Bar No. 319351)
Artur A. Minasyan, Esq.  (Cal Bar No. 322248)
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111
(415) 392-1960
rnelson@sideman.com
jshore@sideman.com
ahe@sideman.com
aminasyan@sideman.com

*Attorneys for Plaintiffs*
*Cisco Systems, Inc. and Cisco Technology, Inc.*

---

[1] Motions for permission to participate in a particular case pursuant to Local Rule 83.4 shall be promptly filed for each of the four Sideman & Bancroft lawyers listed herein.

## JURY DEMAND

Pursuant to Fed. R. Civ. Proc. 38, Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.  hereby demand a trial by a jury on all issues herein so triable.

Date: March 9, 2021:

**LEWIS THOMASON**

By: /s/  Brian S. Faughnan
Brian S. Faughnan, Esq. (BPR # 19379)
One Commerce Square
40 South Main Street, 29th Floor
Memphis, Tennessee 38103
(901) 577-6139
bfaughnan@lewisthomason.com

*Attorneys for Plaintiffs*
*Cisco Systems, Inc. and Cisco Technology, Inc.*